**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **Complainant** | : | |
| | : | |
| v. | : | **Criminal Case No.** |
| | : | |
| **MICHAEL GIANOS,** | : | **1:22-cr-00074 (JMC)** |
| | : | |
| **Defendant** | : | |
| | : | |

_____

**DEFENDANT MICHAEL GIANOS's**
**SENTENCING MEMORANDUM**

Plaintiff MICHAEL GIANOS ("Gianos") by undersigned counsel, hereby submits to the

Court his Sentencing Memorandum as follows:

### I.    INTRODUCTION AND OVERVIEW

Michael Gianos, by counsel, accepts and generally agrees with the Presentencing Investigation

Report (PSR) prepared by the U.S. Probation Office dated June 20, 2023.  Counsel responds that the

analyses and recommendations are consistent with the plea negotiations and expectations of the

Defendant.

However, Gianos disputes topics and issues left open-ended in the Report such that any effort

to expand on the PSR's recommendations by the U.S. Attorney's Office ("USAO") or any surprise or

misinterpretation of what is stated in the PSR's recommendations should be discouraged.  Giano's

Sentencing Memorandum below should be consistent with his Response to the PSR.

After discussion with the USAO, Michael Gianos pled guilty to one count of violating only 18

1

U.S.C. § 1752(a)(1), which prohibits:

18 U.S.C. § 1752(a)(1) *(emphases added)*.

(a)Whoever—
    (1) ***knowingly*** enters or remains in any restricted building or grounds without lawful authority to do so;

* * *

[shall be punished]

* * *

(c)In this section—
    (1)the term "**restricted buildings or grounds**" means any posted, cordoned off, or otherwise restricted area—
        (A) of the White House or its grounds, or the Vice President's official residence or its grounds;
        (B) of a building or grounds where the President or **other person protected by the Secret Service** is or will be temporarily visiting; or
        (C) of a building or grounds so restricted in conjunction with an event designated as a special event of national significance; and

    (2) the term "**other person protected by the Secret Service**" means any person whom the United States Secret Service is authorized to protect under **section 3056 of this title** or by Presidential memorandum, when such person has not declined such protection.

* * *

Said plea agreement with the United States is posted on the Court's electronic records at ECF Dkt. # 72, on April 28, 2023.  The Government prepared a "Statement of Offense" which has been posted as ECF Dkt. # 73 filed on April 28, 2023.  The plea agreement includes stipulating to the Statement of Offense.

## II.   PROCEDURAL HISTORY AND CHARGES

Defendant Gianos was charged by Information filed on March 8, 2022, at ECF Dkt # 1:22-cr-

0074-JMC, with four Counts:

### COUNT I:  18 U.S.C. § 1752(a)(1):

* * *

(**a**)Whoever—

(**1**) knowingly enters or remains in any restricted building or grounds without lawful authority to do so;

* * *

*[may be punished with up to one year in jail, fined, etc.]*

### COUNT II:  18 U.S.C. § 1752(a)(2). Restricted building or grounds states:

(a) Whoever—

* * *

(2) knowingly, and with intent to impede or disrupt the orderly conduct of Government business or official functions, engages in disorderly or disruptive conduct in, or within such proximity to, any restricted building or grounds when,  or so that, such conduct, in fact, impedes or disrupts  the orderly conduct of  Government business or official functions

* * *

### COUNT III:   40 U.S. Code § 5104(e)(2)(D) - Unlawful activities in Capitol building

* * *

(**e**)Capitol Grounds and Buildings Security.—

* * *

(**2**)Violent entry and disorderly conduct.—An individual or group of individuals may not willfully and knowingly—

* * *

(**D**) utter loud, threatening, or abusive language, or engage in disorderly or disruptive conduct, at any place in the Grounds or in any of the Capitol Buildings with the intent to impede, disrupt, or disturb the orderly conduct of a session of Congress or either House of Congress, or the orderly conduct in that building of a hearing before, or any deliberations of, a committee of Congress or either House of Congress;

* * *

**(G)** parade, demonstrate, or picket in any of the Capitol Buildings.

**COUNT IV:   40 U.S.C. 5104(e)(2)(G) –**
**Unlawful activities in Capitol building**
* * *
**(e)**CAPITOL GROUNDS AND BUILDINGS SECURITY.—
* * *
**(2)**VIOLENT ENTRY AND DISORDERLY CONDUCT.—An individual or group of individuals may not willfully and knowingly—
* * *
**(G)** parade, demonstrate, or picket in any of the Capitol Buildings.
* * *

Despite the tendency of the Government and the Probation Office of wanting to sentence Defendants based on the original allegations in the charging documents, not what was proven to be factually true at trial or -- here -- on stipulation, the facts as stated if limited to the PSR's presentation and Statement of Offense support the Probation Office's analysis, conclusions, and recommendations here in this case.

Without envying the difficulty of the Probation Office trying to summarize the facts as actually proven throughout a trial, and recognizing the much-easier task of just summarizing the charging documents instead, the allegations as charged here support the PSR's recommendation.

### III.   MAXIMUM PENALTY

A. The Maximum Penalty for a violation of 18 U.S.C. § 1752(a)(1) is set forth at 18 U.S.C. § 1752(a)(b)(2):

"**(2)** a fine under this title or imprisonment for not more than one year, or both, in any other case."

Pursuant to "18 U.S. Code § 3571 - Sentence of fine" the amount of a fine is $100,000.

Here, in this case, Defendant Gianos did not commit any act nor was he charged with any

4

crime of causing death or any bodily injury.

Under the U.S. Sentencing Guidelines, <u>COUNT I</u> sounds in trespass and the possible penalty is 0 days in jail up to a maximum of one year in jail and a fine of up to $100,000.

In Gianos's sentencing zone, the Court may (and should) impose alternate penalties such as various periods of probation, community service, and/or home confinement.

Restitution is unavailable and would violate the law since Gianos caused no damage "as a result of [this] offense."

## IV.   SENTENCING ANALYSIS UNDER SENTENCING GUIDELINES

The U.S. Probation Office explains and supports in detail the following key results which that office recommends:

- Assigning a total offense level of 4 points within the framework of the U.S. Sentencing Guidelines analogizing the offense pled to of trespassing under §2B2.3 of the Sentencing Guidelines.

- Adding an enhancement of 2 points for the Specific Offense Characteristics (paragraph 39) claiming that the US Capitol is "secured" 24 hours a day.

- Deducting a reduction of 2 points for acceptance of responsibility and cooperation as exemplified by pleading guilty, under §3E1.1(a).

- Assigning a criminal history category of I and adding 1 point for past criminal history.

- As a result, the Probation Office advises that "The maximum term of imprisonment is 12 months for this Class A Misdemeanor," being 18 U.S.C. 1752(a)(1).

- Based on the circumstances of this case, the Probation Office advises that a sentence of zero months to six months is proper and recommends the same range.

- The Probation Office further advises that no sentence of imprisonment is required.

- The Probation Office recommends that Defendant Gianos return a completed Personal Financial Statement as the Office is unable to determine Gianos' ability to pay a fine and/or restitution.

- The Office asserts that under §5E1.2(a) the Court "shall" impose a fine in all cases unless the Defendant establishes that "he is unable to pay and is not likely to become able to pay at any time," which presumably includes by reference to the amount of a proposed fine not merely all or nothing.

- Said Office advises that under the Guidelines, a fine in the range of $500 to $9,500 is applicable.  A maximum of $100,000 is allowable, it advises.

- Gianos has not chosen to contest his ability to pay a fine in the range of $500 to $9,500.

- That Office advises that Defendant could ask the Court to impose no fine.

- Naturally, however, Defendant Gianos like the average person would prefer even an onerous fine over incarceration.

- Supervised release of up to five years is possible that Office advises.  The term of release shall be no more than three years if the offense level is five or less.

- The Probation Office recommends supervised release, if any, of one year.

- However, supervised release is required if the Court imposes a sentence of more than one year.

- The Court may impose all or a combination of the additional conditions of (a) payment of restitution, (b) financial disclosure, (c) community service in lieu of a fine, (d) no possession of or access to firearms and/or dangerous weapons during supervision, (e) monitoring technology for a period of 90 days, (f) following the rules and regulations of the location monitoring program, and (g) substance abuse testing to ensure continued abstinence from illicit substances.

- The Office recommended participation in a Drug Abuse Education Program, although counsel believes that this is precautionary and not a finding that there is a drug abuse problem, at least not currently.  Therefore, counsel would modify any such condition to defer to the recommendation of such a program to determine what they find in fact to be appropriate and necessary in fact.

- The Office recommended participation in a Criminal Thinking Treatment Group, although counsel believes that this is precautionary and not a finding that there is a thinking problem.  Therefore, counsel would modify any such condition to defer to the recommendation of such a program to determine what they find in fact to be appropriate and necessary in fact.

- Drug testing which the Probation Office believes to be mandatory.

- A special assessment of paying $25 is mandatory that Office believes.

**B. Restitution Not Available**

- The Probation Office recommends that Defendant Gianos pay restitution of $500 toward the estimated $2,881,360.20 of damages to the United States Capitol claimed.

Defendant and counsel fully understand that courts may frequently engage in a sliding scale between imposing time in jail as opposed to a fine.  Such flexibility can be important to the courts and to the crowding of jails.  Therefore, the unavailability of an order of restitution may be a bit of a distinction without a (financial) difference and the Court may combine jail time with a fine.

However, an order of restitution is not available because the Defendant did not damage any property or cause any other loss:  The statute cited by the Government in its Sentencing Memorandum **18 U.S. Code § 3663 - Order of restitution** requires (in relevant part):

> **(a)**
>> * * *
>> **(B)**
>> **(i)**The court, in determining whether to order restitution under this section, shall consider—
>>> **(I)**  the amount of the loss sustained by each victim as a result of the offense; and
>>>> * * *

That is, restitution is only authorized for a "loss" that is "as a result of the offense."   Not other offenses – only the offense of which the Defendant is adjudicated guilty.  Specifically, no court has legal authority to order this Defendant to pay restitution of losses that _other people_ caused from _other_ offenses than those Gianos committed himself.

There has been no loss suffered by anyone from Gianos's actions.  Therefore, although the Court may be authorized to order restitution, the applicable amount in this case totals $0.00. [1]

## V.   GOVERNING LAW FOR SENTENCING UNDER 18 USC 3553(a) FACTORS

Federal law codified at 18 U.S.C. § 3553 "Imposition of a Sentence" authorizes a federal court to impose a sentence upon the conviction of a defendant for a crime, including by a plea of guilty, in

---

[1]      The USAO analyzes for every defendant restitution as if every defendant were guilty of every act committed by anyone else, without regard to actual individual guilt.  Restitution by person A cannot mean paying for harm caused by person B.

accordance with that statute's terms and the guidelines promulgated by the U.S. Sentencing

Commission under it authority at law.  Factors governing sentencing are stated in 18 U.S.C. 3553(a).

Sometimes sentencing depends upon specific facts which have not been established and/or

disputed, even outside the trial or even though the trial or a plea deal are concluded.

The U.S. Sentencing Commission, Guidelines Manual, Annotated 2021 Chapter 6 -

Sentencing Procedures, Plea Agreements, And Crime Victims' Rights explains:[2]

> Commentary
>
> Although lengthy sentencing hearings seldom should be necessary, ***disputes about sentencing factors must be resolved with care***.  When a dispute exists about any factor important to the sentencing determination, ***the court must ensure that the parties have an adequate opportunity to present relevant information.***  Written statements of counsel or affidavits of witnesses may be adequate under many circumstances.  <u>See, e.g.</u>, United States v. Ibanez, 924 F.2d 427 (2d Cir. 1991). ***An evidentiary hearing may sometimes be the only reliable way to resolve disputed issues***.  <u>See, e.g.</u>, United States v. Jimenez Martinez, 83 F.3d 488, 494-95 (1st Cir. 1996) (finding error in district court's denial of defendant's motion for evidentiary hearing given questionable reliability of affidavit on which the district court relied at sentencing); United States v. Roberts, 14 F.3d 502, 521(10th Cir. 1993) (remanding because district court did not hold evidentiary hearing to address defendants' objections to drug quantity determination or make requisite findings of fact regarding drug quantity); <u>see also</u>, United States v. Fatico, 603 F.2d 1053, 1057 n.9 (2d Cir. 1979), <u>cert. denied</u>, 444 U.S. 1073 (1980).  The sentencing court must determine the appropriate procedure in light of the nature of the dispute, its relevance to the sentencing determination, and applicable case law.
>
> In determining the relevant facts, sentencing judges are not restricted to information that would be admissible at trial.  <u>See</u> 18 U.S.C. § § 3661; <u>see also</u> <u>United States v. Watts</u>, 519 U.S. 148, 154 (1997) (holding that lower evidentiary standard at sentencing permits sentencing court's consideration of acquitted conduct); <u>Witte v. United States</u>, 515 U.S. 389, 399-401 (1995) (noting that sentencing courts have traditionally considered wide range of information without the procedural protections of a criminal trial, including information concerning criminal conduct that may be the subject of a subsequent prosecution); <u>Nichols v. United States</u>, 511 U.S. 738, 747-48 (1994) (noting that district courts have traditionally considered defendant's

---

[2]      **https://www.ussc.gov/guidelines/2021-guidelines-manual/annotated-2021-chapter-6**

prior criminal conduct even when the conduct did not result in a conviction). Any information may be considered, so long as it has sufficient indicia of reliability to support its probable accuracy.  <u>Watts</u>, 519 U.S. at 157; <u>Nichols</u>, 511 U.S. at 748; <u>United States v. Zuleta-Alvarez</u>, 922 F.2d 33 (1st Cir. 1990), <u>cert. denied</u>, 500 U.S. 927 (1991); <u>United States v. Beaulieu</u>, 893 F.2d 1177 (10th Cir.), <u>cert. denied</u>, 497 U.S. 1038 (1990).  Reliable hearsay evidence may be considered.  <u>United States v. Petty</u>, 982 F.2d 1365 (9th Cir. 1993), <u>cert. denied</u>, 510 U.S. 1040 (1994); <u>United States v. Sciarrino</u>, 884 F.2d 95 (3d Cir.), <u>cert. denied</u>, 493 U.S. 997 (1989).  Out-of-court declarations by an unidentified informant may be considered where there is good cause for the non-disclosure of the informant's identity and there is sufficient corroboration by other means.  <u>United States v. Rogers</u>, 1 F.3d 341 (5th Cir. 1993); <u>see also</u> <u>United States v. Young</u>, 981 F.2d 180 (5th Cir.), <u>cert. denied</u>, 508 U.S. 980 (1993); <u>United States v. Fatico</u>, 579 F.2d 707, 713 (2d Cir. 1978), <u>cert. denied</u>, 444 U.S. 1073 (1980).  Unreliable allegations shall not be considered.  <u>United States v. Ortiz</u>, 993 F.2d 204 (10th Cir. 1993).

*Id. (Bolded and italicized emphases added).*

The Court will consider the factors under 18 U.S.C.§ 3553(a) in crafting a sentence that is clearly at the low end of the sentencing range.  As typically asserted by the USAO, these factors of that statute include:

(1)   the nature and circumstances of the offense and the history and characteristics of the defendant;

(2)  the need for the sentence imposed—

(A)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B)    to afford adequate deterrence to criminal conduct;
(C)   to protect the public from further crimes of the defendant; and
(D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

Yet "these offenses."   referred to in 18 U.S.C.§ 3553(a) here is only 18 U.S.C. 1752(a)(1) of entering or remaining in a restricted area, temporarily restricted because of the presence of a Secret Service protectee.

The USAO consistently wants to analyze "the nature and circumstances" of offenses by other people, which Defendant Gianos did not commit, is not guilty of, and which form no part of what is currently before the Court now.  The USAO has often asked the Court to sentence *other people* who are not before this Court in this case and transfer into this case the misconduct of *other people* not before the Court in this case.

a. The "nature … of the offense" concerns the offense in particular of 18 U.S.C. 1752(a)(1), sounding in mere trespass.

b. The "circumstance of the offense" concerns the offense in particular of 18 U.S.C. 1752(a)(1), sounding in mere trespass

c. The need for the sentence imposed "to reflect the seriousness of the offense" concerns the offense in particular of 1752(a)(1), sounding in mere trespass.

d. The need for the sentence imposed "to promote respect for the law," concerns the offense in particular of 18 U.S.C. 1752(a)(1) 1752(a)(1), sounding in mere trespass.

e. The need for the sentence imposed "to provide just punishment for the offense," concerns the offense in particular of 1752(a)(1), sounding in mere trespass.

f. The need for the sentence imposed "to promote respect for the law" concerns the offense in particular of 1752(a)(1), sounding in mere trespass.

g. The need for the sentence imposed "to afford adequate deterrence to criminal conduct," concerns the offense in particular of 1752(a)(1), sounding in mere trespass.

h. The need for the sentence imposed "to protect the public from further crimes of the defendant," concerns the offense in particular of 1752(a)(1), sounding in mere trespass.

Indeed, to sentence Gianos as if he committed the very serious crimes charged against others

of assaulting police officers, damaging federal property, and brawling with police or worse would

actually – and actually does in fact – promote disrespect for the law.

## VI.   CRIMINAL HISTORY

a.   The U.S. Sentencing Guidelines require that:

### §4A1.2.   Definitions and Instructions for Computing Criminal History

#### (a)   Prior Sentence

(1)   The term "prior sentence" means any sentence previously imposed upon adjudication of guilt, whether by guilty plea, trial, or plea of <u>nolo contendere</u>, for conduct not part of the instant offense.

(2)   If the defendant has multiple prior sentences, determine whether those sentences are counted separately or treated as a single sentence. Prior sentences always are counted separately if the sentences were imposed for offenses that were separated by an intervening arrest (<u>i.e.</u>, the defendant is arrested for the first offense prior to committing the second offense). If there is no intervening arrest, prior sentences are counted separately unless (A) the sentences resulted from offenses contained in the same charging instrument; or (B) the sentences were imposed on the same day. Treat any prior sentence covered by (A) or (B) as a single sentence. <u>See also</u> §4A1.1(e).

For purposes of applying §4A1.1(a), (b), and (c), if prior sentences are treated as a single sentence, use the longest sentence of imprisonment if concurrent sentences were imposed. If consecutive sentences were imposed, use the aggregate sentence of imprisonment.

* * *

(e)   Applicable Time Period

(1)   Any prior sentence of imprisonment exceeding one year and one month that was imposed within fifteen years of the defendant's commencement of the instant offense is counted. Also count any prior sentence of imprisonment exceeding one year and one month, whenever imposed, that resulted in the defendant being incarcerated during any part of such fifteen-year period.

* * *

Furthermore,

> (2)    Any other prior sentence that was imposed within ten years of the defendant's commencement of the instant offense is counted.

> (3)    ***Any prior sentence not within the time periods specified above is not counted.*** (Emphasis added.)

* * *

## VII.    "GUILTY VIEWING" OF CRIMES OF OTHERS or SEEING VIOLENCE

The Government has developed a strange concept of attempting to accuse and punish people for seeing violence committed by others which the accused had nothing to do with.   This peculiar idea of punishing "guilty viewing" must be questioned.

The Government apparently misunderstands a split decision on April 6, 2022, by the Honorable District Court Judge Trevor McFadden, including in *United States v. Matthew Martin*, Case No. 1:21-cr-00394, in this District.  Judge McFadden found Matthew Martin not guilty because the U.S. Capitol Police had not given notice to the public of a restricted area under 18 U.S.C. 1752(a)(1) (that is, notice that had been posted on flimsy 11 inch by 14 inch paper was no longer visible after efforts by some to remove barricades) and police officers did not express any discouragement of Martin entering the Capitol.

But McFadden found another Defendant had evaded a "cordon" of police officers sufficiently to violate the designation of a restricted area by a "cordon" of police in 18 U.S.C. 1752.

It is not a crime to see other people committing violence.  18 U.S.C. 1752 does not require anyone to turn around and leave upon seeing someone misbehaving.  Seeing guilt does not create guilt.  Seeing people brawling would lead a reasonable person to conclude that those people will be

arrested while the overwhelming majority of demonstrators may continue to exercise their rights.

## VIII.   HEARING ALARMS DOES NOT CREATE GUILT

The Government is similarly intensely interested in whether people heard alarms.  But 18

U.S.C. 1752 is about Secret Service protectees.  It is not about hearing alarms.  Anyone who has been

to a public high school has heard or heard about someone pulling  the fire alarm at the school.

## IX. CIRCUMSTANCES – MISCHARACTERIZING THE CAPITOL

Here, the Government repeats its narrative of what some people – not Gianos – did on or

about January 6, 2021, at or near the U.S. Capitol and/or its grounds.  The Government's narrative is

not supported by admissible facts in many respects.  For example, 18 U.S.C. 1752 applies only to

temporary restrictions arising from the presence of a Secret Service protectee.  The Capitol cannot be

closed for any other purpose and yet still be regulated under 18 U.S.C. 1752.  The Capitol could be

closed for repairs or COVID or for some other reason, yet 18 U.S.C. 1752 would not be applicable.

In that sense, it is not an anti-trespassing statute.  It is limited in its application to temporary

restrictions designated presumably by the Secret Service.  (Other cases in this District have rejected

the idea that only the Secret Service can issue the restriction, but the alternative is untenable and

illogical, if anyone with no relationship to the Secret Service can declare a restriction in support of the

Secret Service, even if the Secret Service doesn't ask for it.)

Therefore, the Government tries to lean heavily on the untenable claim that only "authorized"

visitors may enter the U.S. Capitol building, which is plainly untrue.  Just as visitors to the E. Barrett

Prettyman federal courthouse can only enter through a security checkpoint, but are never asked where

they are going or why, do not need an appointment or authorization, and may freely audit any trial or

hearing not specially closed in this courthouse without any reason why, the U.S. Capitol and its office

buildings are the same. People may enter the Capitol buildings without telling the security staff where they are going, why, or to see whom.  Thus, the heavy reliance on "authorization" and other details of the Government's standard narrative are clearly untrue.

As Federal courts in this District have reasoned in reaching legal conclusions:

> ***The Capitol Grounds*** (excluding such places as the Senate and House floors, committee rooms, etc.) ***have traditionally been open to the public***; indeed, thousands of people visit them each year. Thus, we cannot agree with the defendants that the Capitol Grounds have ever been characterized by the serenity and quiet of a hospital or library.

*Jeannette Rankin Brigade v. Chief of Capitol Police*, 342 F. Supp. 575 (D.D.C. 1972) *(emphases added).*

> The courts in this jurisdiction have long recognized that ***"[t]he United States Capitol is a unique situs for demonstration activity"*** and ***"is a place traditionally open to the public thousands visit each year to which access cannot be denied broadly or absolutely,*** [a fact which must be weighed] against the government's interest in protecting against possible `damage to buildings and grounds, obstruction of passageways, and even dangers to legislators and staff.'" *Kroll v. United States*, 590 F. Supp. 1282, 1289, 1290 (D.D.C.1983) (*quoting Jeannette Rankin Brigade v. Chief of Capitol Police*, 342 F. Supp. 575, 583-85 (D.D.C.), *aff'd mem.,* 409 U.S. 972, 93 S. Ct. 311, 34 L. Ed. 2d 236 (1972)).

*Wheelock v. United States* 552 A.2d 503, 506 (D.C. 1988) *(emphases added).*

So very public is the Capitol, that built into the physical building from its initial construction are public viewing galleries allowing any member of the public – for no reason other than a desire to watch their Representatives and Senators at work – may sit and watch the House of Representatives and the U.S. Senate while in session. [34]  There is no physical barrier – even to this day – between the Chambers in session and the public watching from the balcony galleries.  If a member of the public

---

[3]      See:  Large Public Galleries in New Legislative Chambers, Library of Congress exhibit, **https://www.loc.gov/exhibits/uscapitol/s5.html** :  Thomas U. Walter. "Details of Gallery in Hall of Representatives," 1856. Ink and water color on paper. Architect of the Capitol (204)

[4]      This is changed only in the sheer quantity of citizens in our growing nation and the number of persons who want to watch from the viewing galleries, leading to time limits for rationing.  But the public purpose of the U.S. Capitol has been set since the first construction blueprints were drawn.

wished to – not advisable, of course – toss a candy bar down to his willing U.S. Senator, the physical structure of the Senate chambers would make that possible.

Not only are the Capitol Grounds a national park, but the Capitol building is a museum in which hangs some of our nation's most iconic historic art.[5]

## X.   WHAT THE COURT MAY NOT CONSIDER:  CROWD LIABILITY

A few hundred people out of the crowd of 10,000 committed violence against people and things, battled with police, injured about 140 police officers, damaged federal property at the Capitol, and some even tried to break through the doors to the Senate and House chambers.

However, here, in this case, the security camera video – that is, the Government's own evidence – shows with unmistakable clarity and precision that most of those who intruded into the U.S. Capitol building clearly had no plans whatsoever, no sense of direction, no commonality, etc.[6]

Crowds do not do things.  Individuals do things.  Crowds do not.

> This is where things fall apart. Although both Governor DeSantis and Sheriff Williams argue that the phrase "willfully participate" is commonly understood, neither party offers an actual definition. Is it enough to stand passively near violence? What if you continue protesting when violence erupts? What if that protest merely involves standing with a sign while others fight around you? Does it depend on whether your sign expresses a message that is pro- or anti-law enforcement? What about filming the violence? What if you are in the process of leaving the disturbance and give a rioter a bottle of water to wash tear gas from their eyes?
>
> The Governor would have this Court pencil in an exception for a person who merely "attend[s]" a violent demonstration but does not actively engage in violence or conduct that poses an imminent risk of injury or property damage. ECF No. 99 at 13. But the Governor offers no explanation or construction that

---

[5]   **https://www.aoc.gov/explore-capitol-campus/buildings-grounds/capitol-building/rotunda**
[6]   *See,* Capitol Security camera video, produced by USAO as 7029 USCS 02 Rotunda Door Interior-2021-01-06_15h15min01s000ms.mp4 from USCP OPR Report 21-007, Exhibit 6 CCTV Recordings, from production DT_DocID: USCP-003-00000167, produced 11/18/2021, in Global Production DOJCB_008

limits when mere attendance becomes participation, except that a person must "intend to commit violence." Id. But this ignores the plain text of the statute, which separates a person from an assembly of three or more persons sharing that intent. See *infra.*

*See, The Dream Defenders, et al., v. Ron DeSantis,* 21-cv-191, ECF No. 137 (N.D. Fla. Sept. 9, 2021), (Mark E. Walker, Chief United States District Judge), Page 53 (injunction against anti-riot law in part because the legislation appeared to criminalize the defendant's protest activities even if he did not participate in the violent acts of others), attached as **Exhibit**.  And continuing:

> If this Court does not enjoin the statute's enforcement, ***the lawless actions of a few rogue individuals could effectively criminalize the protected speech of hundreds, if not thousands, of law-abiding Floridians***. This violates the First Amendment. See, e.g., *Bible Believers v. Wayne Cnty.*, Mich., 805 F.3d 228, 252 (6th Cir. 2015). Florida's interest in preventing public violence is beyond question, but when that interest collides with rights guaranteed by the First Amendment, the "government may regulate in the area only with narrow specificity." *Button*, 371 U.S. at 433. Otherwise, those rights, which "are delicate and vulnerable, as well as supremely precious in our society," may be suffocated. Id. Section 870.01(2), through its ambiguity, chills speech and eviscerates that essential breathing space. The law is overbroad.[27]
>
> Accordingly, I conclude that Plaintiffs have established a substantial likelihood of success on the merits as to their overbreadth claim.

*Id.,* at Page 77 (emphases added).

Collectivist punishment is not permitted nor constitutional within U.S. criminal law.  Not only is collective punishment outlawed by the Geneva Convention but it is unconstitutional under due process and the Fifth Amendment.  Despite the persistent arguments of the U.S. Attorney's Office, no person under the U.S. Constitution may be convicted or sentenced for what other people did.

## XI.   DEFENDANT OBJECTS TO CRIMINALIZATION OF HIS POLITICAL SPEECH AND VIEWS

The Government continues its tendency to present political opinions or protected speech as evidence that the Defendant is a criminal.  The Government passes this off as tangentially related to proving the elements of a crime, but spills over quite extensively into pure free speech issues.

Despite what might be hypothetically true in some other case, the accusations of Giano's expression of free speech here are simply not – in fact – necessary to nor supportive of finding guilt of any non-speech crime.  They are mentioned as being part of proof of the crime, but Defendant responds that they are actually not.

## XII.   COURT MAY NOT CONSIDER FACTS DISPUTED OR CRIMES NOT CHARGED

Unfortunately, the USAO has shown a pattern in sentencing proceedings to try to accuse Defendants of additional crimes for which they have not been found guilty and argue facts not proven and legal conclusions not agreed to by the Court.  Giano is officially not guilty of any crime but 18 U.S.C. 1752(a)(1).

## XIII. AVOIDING UNDUE DISPARITIES IN SENTENCING: AVOIDING DISPARITIES IN SENTENCING BY CONSIDERING ONLY JANUARY 6 RELATED CRIMES

In pursuit of the U.S. Sentencing Guidelines' primary purpose of minimizing disparities in sentencing, the PSR's paragraph 131 makes reference to the Government's error of considering only January 6 cases.  The Court must minimize disparities among all cases from the same charge, not merely among January 6 prosecutions.  That would produce the opposite result of the U.S. Sentencing Guidelines' very purpose.

The Probation Office, DoJ, USAO, and the Court must compare every January 6 sentencing not merely to other January 6 cases but to all cases under which a Defendant is sentenced for the same criminal charge, here 18 U.S.C. 231(a)(3) – present in all of the examples cited.  The relevant comparison is not a self-referential loop of only January 6 cases.  Sentencing consistent only with January 6 cases but highly discordant of other cases would not fulfill the purposes of the U.S.

Sentencing Reform Act of 1984.

In 2011, rioters entered and physically occupied the Wisconsin State legislature, followed by months of disruptive protests mostly outside but also inside the Capitol building of Wisconsin.[7] Those who sought to obstruct official proceedings to prevent the passage of legislation they disapproved of were mostly not arrested or given minor fines or probation.  As in every such non-January 6 case, there is no dispute about the goals or organizing which were proudly and openly admitted in Wisconsin.

In 2023, State legislatures in Florida, Montana, Tennessee were physically disrupted by protestors against Republican legislation, but the DoJ has taken no action to defend these official proceedings.

In September 2018, opponents of Judge Brett Kavanaugh's nomination to the U.S. Supreme Court openly and publicly organized and advertised their plans to obstruct an official proceeding in violation of 18 U.S.C. 1512(c)(2) by shutting down the U.S. Senate Judiciary Committee's hearings and confirmation of Kavanaugh to become a Supreme Court Justice. Where the Department of Justice merely suspects and speculates about January 6 Defendants, anti-Kavanugh rioters openly admitted it. Protestors celebrated on line occupying and taking over the Hart Senate Office Building.  The 2018 demonstrators proudly admitted their conspiracy to obstruct congressional proceedings: [8]

> "It's sort of a coordinated dance, **but the performers are an organized group of protesters** and a dozen or so uniformed Capitol Police officers. And the stage is this week's Senate

---

[7]  "Thousands storm Capitol as GOP takes action," <u>Wisconsin State Journal</u>, March 10, 2011, updated February 19, 2015, ("Thousands of protesters rushed to the state Capitol Wednesday night, forcing their way through doors, crawling through windows and jamming corridors"), accessible at: **https://madison.com/wsj/news/local/govt-and-politics/thousands-storm-capitol-as-gop-takes-action/article_260247e0-4ac4-11e0-bfa9-001cc4c03286.html**

[8]  Note that the statute of limitations will not expire until September 26, 2023, and the USAO could prosecute these rioters using a consistent standard as to January 6, 2021.

confirmation hearings for Supreme Court nominee Brett Kavanaugh." One by one, the protesters, many wearing T-shirts reading 'I am what's at stake,' interrupt the proceedings by shouting slogans like 'You're making a mockery of democracy!' or 'Senators: Do your jobs and stop this hearing!' The police then warn that further disruption will result in arrests. Minutes later, the person shouts again and is hustled out a side door…**the protesters are part of a nationwide campaign to disrupt the confirmation process**."

*Id. (Emphasis added).*

The few of those Left-wing insurrectionists arrested [9] were released on a $35 to $50 bail after 5 hours which became their sole punishment in most cases after their cases were dropped. [10]

*See,* **https://twitter.com/womensmarch/status/1047935356673437697** (hear the extreme noise of the alarms and crowd disrupting the Hart Building in the video). See

**https://www.facebook.com/watch/?v=2314502548791821**



*Erin Franczak and Katherine Tully-McManus,  "'**I See You, Senators**': Kavanaugh Protesters Pour Into the Capitol:* Supporters of Christine Blasey Ford **sing, raise fists, invoke regression analysis**," Roll Call, *September 27, 2018, accessible at:*  **https://rollcall.com/2018/09/27/i-see-you-senators-kavanaugh-protesters-pour-into-the-capitol/**  And:  Sophie

---

[9]      Emily Birnbaum, "Over 200 protesters arrested during Kavanaugh hearings," The Hill, September 6, 2018, accessible at:  **https://thehill.com/homenews/senate/405500-212-protesters-total-arrested-during-kavanaugh-hearings**;

[10]      Ashraf Khalil, "Protesters continue to interrupt Kavanaugh hearings," Associated Press, 09/06/2018, accessible at:  **https://apnews.com/article/3f4ddaec0ee946fe817329b065af3408; accessed Nov 6, 2021;** *emphasis added.*

Tatum, "More than 300 protesters arrested as Kavanaugh demonstrations pack Capitol Hill," October 5, 2018, accessible at:
**https://www.cnn.com/2018/10/04/politics/kavanaugh-protests-us-capitol**





During that riot, Sen. Schumer led a crowd at the closed doors of the U.S. Supreme Court at which rioters banged on the doors of the U.S. Supreme Court.  Sen. Chuck Schumer openly threatened Justices of the U.S. Supreme Court,

> "'I want to tell you Gorsuch, I want to tell you Kavanaugh - you have released the whirlwind, and you will pay the price. You won't know what hit you if you go forward with these awful decisions,'

Schumer told the cheering crowd.  Senator Schumer's public threats against the U.S. Supreme Court drew a rare public rebuke from U.S. Supreme Court Chief Justice John Roberts." [11]

In May to June 2020, rioters and insurrectionists attacked the White House from their rallying point at Lafayette Square.[12]   America's international enemies and friends watched as the U.S. Government and its worldwide military power were paralyzed by anarchist rioters.  These rioters obstructed official proceedings at the White House in violation of 18 U.S.C. 1512(c)(2) interfering with and impeding the world-wide military chain of command of the U.S. Government.  Not only were charges dropped against those arrested but rioters sued the District of Columbia and won millions of dollars. [13]

In January 2017, rioters burned police cars, limousines, stores, and the like professing their plans to prevent President Donald Trump from assuming the office of the President.  Hundreds were arrested but then released with most charges dropped.

---

[11]     https://www.reuters.com/article/us-usa-court-abortion-scene/u-s-chief-justice-slams-schumer-for-dangerous-comment-on-justices-in-abortion-case-idUSKBN20R2KX

[12]     Melissa Barnhart, , "Historic St. John's Church near White House torched by rioters," Christian Post, June 1, 2020, accessible at:  https://www.christianpost.com/news/historic-st-johns-episcopal-church-set-on-fire.html

[13]     See:  Aila Slisco, "Government Settles Civil Cases With Protesters Injured at Lafayette Square," NEWSWEEK, April 13, 2022, accessible at:  https://www.newsweek.com/government-settles-civil-cases-protesters-injured-lafayette-square-1697820



**More Than 200 Arrested in D.C. Protests on Inauguration Day**

217 people were arrested and six police officers suffered minor injuries after some protesters set fires and smashed windows in the nation's capital.

— Police and demonstrators clash in downtown Washington, D.C. after a limo was set on fire following the inauguration of President Donald Trump on Jan. 20. Spencer Platt / Getty Images

**Washington (CNN)** — Six police officers were injured and 217 protesters arrested Friday after a morning of peaceful protests and coordinated disruptions of Donald Trump's inauguration ceremony *gave way to ugly street clashes in downtown Washington.*

*At least two DC police officers and one other person were taken to the hospital after run-ins with protesters*, DC Fire Spokesman Vito Maggiolo told CNN. Acting DC Police Chief Peter Newsham said the officers' injuries were considered minor and not life threatening.

Bursts of chaos erupted on 12th and K streets as black-clad "antifascist" protesters ***smashed storefronts and bus stops, hammered out the windows of a limousine and eventually launched rocks at a phalanx of police lined up in an eastbound crosswalk.*** Officers responded by launching smoke and flash-bang devices, which could be heard from blocks away, into the street to disperse the crowds.

Gregory Krieg, "**Police injured, more than 200 arrested at Trump inauguration protests in DC**," CNN, Updated January 21, 2017, accessible at: **https://www.cnn.com/2017/01/19/politics/trump-inauguration-protests-womens-march** *(Emphases added.)*



*Also see* Phil McCausland, Emmanuelle Saliba, Euronews, Erik Ortiz and Corky Siemaszko, "**More Than 200 Arrested in D.C. Protests on Inauguration Day:  217 people were arrested and six police officers suffered minor injuries after some protesters set fires and smashed windows in the nation's capital**," <u>NBC News</u>, January 21, 2017, accessible at:  **<u>https://www.nbcnews.com/storyline/inauguration-2017/washington-faces-more-anti-trump-protests-after-day-rage-n709946</u>**

But then: "**GOVERNMENT DROPS CHARGES AGAINST ALL INAUGURATION PROTESTERS**," <u>NBC News</u>, July 6, 2018,  accessible at:

**<u>https://www.nbcnews.com/news/us-news/government-drops-charges-against-all-inauguration-protesters-n889531</u>**

Therefore, it is an error now for the U.S. Probation Office, Department of Justice, and/or U.S. Attorney's Office to compare the sentencing of January 6 Defendants only to other January 6 cases. This arbitrary analysis is precisely in conflict with the U.S. Sentencing Guidelines' reason for existing.  Picking only other January 6 cases as the framework undermines the goal of minimizing disparity.

This Court must minimize disparity among all types of cases, not aggravate and inflame disparity by selective punishment of only January 6 cases as an echo chamber.

Dated:  July 11, 2023                              RESPECTFULLY SUBMITTED

**MICHAEL GIANOS,** *By Counsel*


_____/s/\_\_John M. Pierce_____
John M. Pierce, Esq.
John Pierce Law Firm
21550 Oxnard Street
3rd Floor, PMB #172
Woodland Hills, CA 91367
Tel: (213) 400-0725
Email: ***jpierce@johnpiercelaw.com***
Attorney for Defendant


## CERTIFICATE OF SERVICE

I hereby certify that this document is being filed on this July 11, 2023, with the Clerk of the Court by using the U.S. District Court for the District of Columbia's CM/ECF system, which will send an electronic copy of to the following CM/ECF participants.  From my review of the PACER account for this case the following attorneys are enrolled to receive notice and a copy through the ECF system.

MATTHEW M. GRAVES
United States Attorney

Joseph H. Huynh, Esq.
United States Attorney's Office
For the District of Columbia
601 D. Street, NW
Washington, DC 20530
Telephone:  (202) 252-7215


_____/s/_____
John M. Pierce, Esq.